397 So.2d 1063 (1981)
CONCERNED CITIZENS OF RAPIDES PARISH and Lorena Pospisil, Plaintiffs-Appellees,
v.
Paul HARDY, Secretary of the Louisiana Department of Transportation and Development, Defendant-Appellant.
No. 8110.
Court of Appeal of Louisiana, Third Circuit.
March 26, 1981.
Dissenting Opinion March 30, 1981.
Rehearing Denied May 11, 1981.
*1065 William J. Doran, Jr., Baton Rouge, for defendant-appellant.
Christopher J. Roy, Alexandria, for plaintiffs-appellees.
Before DOMENGEAUX, GUIDRY, CUTRER, SWIFT and LABORDE, JJ.
GUIDRY, Judge.
In this suit the plaintiffs, Ms. Lorena Pospisil and a group of people who style themselves as "Concerned Citizens of Rapides Parish"[1] seek issuance of a permanent injunction and/or declaratory relief which would prevent the State of Louisiana, Department of Transportation and Development (hereafter DOTD) from going forward with the letting of bids and the construction of a vertical lift-style bridge over the Red River in Rapides Parish, Louisiana, on State Project No. 700-08-69. In support of their demand for the relief sought plaintiffs urge that DOTD has failed to comply with the provisions of the National Environmental Policy Act (42 U.S.C.A. § 4321 et seq.). Defendant filed exceptions of no right and no cause of action and an answer averring full compliance with NEPA and other laws of the State of Louisiana.
*1066 The exceptions were referred to the merits and after a lengthy hearing the exceptions were overruled and judgment was rendered by the trial court granting a preliminary injunction enjoining and restraining defendant from taking any further steps in connection with State Project XXX-XX-XX pending further orders of the court. From this judgment defendant has prosecuted this appeal.
Before proceeding to a discussion of the issues raised on appeal it is appropriate and necessary to set forth the factual circumstances giving rise to the instant litigation.
The cities of Alexandria and Pineville, Louisiana, are separated one from the other by the Red River. There are three bridges which cross the Red River in the immediate vicinity of these two cities, the O.K. Allen bridge, a high-rise bridge located some distance from the downtown area of the two cities; and, two lift-style bridges known as the Fulton Street and Murray Street bridges, which are located approximately 2000' apart, in and/or near the downtown area of both cities. Pursuant to State Project No. 700-08-69 the DOTD proposes to replace the existing "Murray Street" bridge,[2] which connects downtown Alexandria and downtown Pineville, with a semi-high-level vertical lift span to be constructed approximately 400 feet northwest from the existing structure. After construction the bridge would connect Main Street in Pineville to Jackson Street in Alexandria.
Planning for the construction of the new bridge began in the year 1973. In the initial planning stages the DOTD informed local officials that a semi-high lift-style bridge serving the same traffic corridor was contemplated.[3] Sometime in late 1973 or early 1974 the DOTD contracted with the firm of Palmer and Baker, an engineering firm of Mobile, Alabama, to prepare design proposals for a lift-style bridge to replace the existing Murray Street bridge. In addition to this action the DOTD began to make environmental studies for the purpose of ultimately complying with NEPA.[4] On April 27, 1975, pursuant to 42 U.S.C. § 4332(2)(C), the DOTD prepared, in consultation with the Federal Highway Administration (hereafter, FHA), a document entitled "Environmental Assessment". The latter document described the proposed action, the alternatives considered, and the probable social, economic and environmental impact of such action. Thereafter, along these same lines, a document entitled "Draft Negative Declaration" was prepared and filed on July 29, 1975. This latter document indicates that the proposed replacement of the Murray Street bridge will have no significant impact on the environment and that a "Negative Declaration" rather than an "Environmental Impact Study" is warranted under the provisions of NEPA. Petitioners point out that in neither of these documents was a high-rise bridge replacement considered as an alternative nor do such studies address the frequent openings of such proposed bridge for river traffic and the environmental impact such openings will have on traffic, air pollution, noise, loss of man hours and expense to employers and employees etc.
On September 16, 1975 the DOTD conducted a "Corridor Location Public Hearing" in Alexandria.[5] At this meeting interested persons were afforded an opportunity to express their views concerning the proposed location of the facility, its general design features and the environmental effects of the proposed project. Many persons *1067 in attendance at this hearing expressed the need for a high-rise bridge as opposed to a lift-style bridge although there was no real disagreement over the need for a new facility or that it should be located so as to keep the corridor at Jackson and Murray streets as proposed by the DOTD. Sometime following this hearing the DOTD contacted Palmer & Baker and requested a study regarding the feasibility of a high-rise bridge at various locations but basically in the Jackson Street corridor. As a result of this study several alternatives were proposed by Palmer and Baker, however, none were acceptable. Two of the proposed alignments were unacceptable because such proposed projects could not be constructed with bridge replacement funds. Another alignment (the "Elliott Street Alignment") was rejected because of its proximity to an existing hospital and the taking of properties adjacent to property belonging to the Catholic Diocese of Alexandria and because the touchdown point would have been well beyond Fourth Street. Another alignment, referred to in the record as Scheme 1, with a touchdown on Jackson Street was rejected because although structurally satisfactory it was geometrically imperfect.[6] Following the latter study and on March 29, 1978, the DOTD prepared and filed pursuant to 42 U.S.C. § 4332(2)(C) and 23 U.S.C. § 128(a) a "Final Negative Declaration" proposing to construct a vertical lift bridge[7] as a replacement for the old "Murray Street" bridge. The "Final Negative Declaration" states as follows regarding the sufficiency of such declaration in lieu of a detailed environmental impact statement:
"The effect of the project on the air, noise, and water will be minimal as explained in Section 3. The relocations will be few and will not constitute a major disruption of the community. The existing and proposed land use will not be adversely affected. Construction impacts will be temporary, and the existing bridge will continue to be used until the new bridge is completed. Because the adverse environmental effects will be few and temporary, this project is not expected to cause any long-term ill effects to the cities of Alexandria and Pineville."
The FHA concurred in the filing of the "Final Negative Declaration" and thereafter, presumably when the DOTD advertised for bids for the construction of the proposed bridge, this suit was instituted.
At trial on the merits, it was basically the position of plaintiffs that the proposed action by the DOTD was not preceded by a thorough investigation and study of the impact frequent openings of a vertical lift bridge would have on the environment. Particularly, plaintiffs urge that the studies do not consider or allude to the effect frequent bridge closures for the passage of water traffic will have on traffic in the downtown areas of Alexandria and Pineville; the cost to employers and employees of delays caused by bridge closures; and, the overall loss in productivity. In this same vein, plaintiffs contend that the consideration and study by Palmer and Baker and the DOTD of high-rise bridge alternatives was perfunctory and that neither ever seriously and conscientiously studied or considered the high-rise bridge alternatives available to the Alexandria-Pineville area. Plaintiffs contended that if such studies had been made a substantial impact on the environment would be demonstrated requiring an "Environmental Impact Statement" (EIS) as opposed to a "Negative Declaration". Thus plaintiffs contend the proposed action by defendant is in violation of the provisions of NEPA and should be enjoined.
The trial court, after overruling defendant's exceptions of no right and no cause of action, concluded, for written reasons assigned, that the requirements of NEPA had *1068 not been satisfied. In reaching this conclusion the trial court made the following findings:
"1. Local officials acquiesced in the lift-style bridge proposal in the early meetings because they were told by state and federal officials that funding was not available except for a lift-style bridge. The record reflects that funding for a high-rise bridge was available.
2. The Department of Transportation and Development operated under the faulty premise that the proposed bridge could not penetrate Main Street in Alexandria whereas the then Alexandria mayor and the commissioner of streets and parks in meetings with defendant and federal and highway officials offered to lower Main Street to have a high-rise bridge with a touchdown on the north end of Third Street. The record does not reflect that this proposal was ever studied or presented at any public hearing or included in the final Negative Declaration.
3. The consulting engineers, Palmer and Baker of Mobile, Alabama, substituted their judgment rather than considering that of local city officials on the effect of a bridge touchdown point past Main Street. Because of this error in judgment they did not conduct a thorough and competent study of the bridge alternatives available to the Alexandria-Pineville area, and make a fully informed recommendation to the defendant.
4. From the beginning of the project the defendant only considered building a lift-style bridge as shown by CC-1 (1975 environmental assessment) and the public was so informed at the 1975 corridor location hearing (CC-3, page 13) that funds were not available for a high-rise bridge. The State's original contract with Palmer and Baker was for a lift-style bridge. No high-rise alternative was presented at either public meeting, and only after much public clamor did the defendant consider it as an alternative, and when considered did not give it as much consideration as it did its earlier proposals (see CC-5) as NEPA requires. Such conduct by the defendant is hardly defensible and is evidence to this Court that it did not adequately study the high-rise alternative.
5. Further, the public views at the design public hearing (CC-4) held in (sic) August 7, 1978, were not included in the final Negative Declaration (CC-5) as it was compiled and approved by the Federal Highway Administration on March 29 1978, several months prior to the design hearing. This further shows that the defendant did not approach the design hearing with an open mind to evaluate the views to be expressed by the people of the Alexandria-Pineville area at the hearing as NEPA contemplates.
6. As proposed, downtown Alexandria-Pineville will be served by two lift-style bridges approximately two thousand feet apart with minimum heights of ninety nine feet and one hundred four feet. Due to the heights' similarity and the proximity of the bridges, one must reason that bridge openings could affect both bridges at the same time. Projected openings of the proposed bridge will entail at least eight to twenty minutes per opening. The older Fulton structure will require a longer time. Vehicular and pedestrian traffic will back up on both sides of the river resulting in noise and air pollution, traffic congestion on the bridge arteries and cross streets in downtown Alexandria and Pineville. The defendant admits it did not consider these factors important. This Court disagrees. These are significant factors affecting the human environment and must be studied.

7. There was no study made of the lost time of employees commuting to either side of the river. Because of the unique geography of the metropolitan area as previously described, this is an important factor to consider and should have been studied. The only economic study made was road-user costs or the cost of a commuter travelling from a closed bridge to an open bridge. If the defendant's engineers had studied the geography of the area along with the close proximity of the proposed structure to *1069 the present Fulton bridge, reason would require a more thorough origin and destination study than that made by the defendant.

8. The Department of Transportation and Development was presented in early June, 1980, with a Corps of Engineers' proposal that the proposed pool stage of the Red River will be raised from fifty-eight feet to sixty-four feet. The original Corps projection at the fifty-eight foot pool stage would require the proposed bridge to open for twenty per cent of the barge traffic. During the taking of evidence in this case, this was revised to twenty-seven per cent. At the sixty-four foot pool stage, now under consideration by the Corps, the proposed bridge would be required to open for sixty (sic) four per cent of the barge traffic, a two hundred twenty per cent increase in openings over the first projection. These revisions and proposed actions came after the preparation of the final Negative Declaration. The defendant studied this proposal and decided that, even with the pool stage at sixty-four feet and more bridge openings being required (at the Fulton bridge and proposed structure), the proposed structure would still not have a significant effect on the human environment. Such a conclusion, in light of the considerations hereabove noted on traffic congestion, shows clearly that an inadequate study was made of the effect of this impact factor. A good faith effort was required of the State when confronted with this proposal and this Court rules that the State has failed in its duty."
Defendant has appealed specifying the following errors:
1. The Court erred in failing to sustain the exceptions of no cause of action and no right of action filed by defendant.
2. The Court erred in misapplying the provisions of the National Environmental Protection Act and, particularly in its findings that a negative declaration as filed by the Department in this matter was not in compliance with the National Environmental Protection Act.
3. The Court erred in finding that the actions of defendant in this matter were unreasonable, arbitrary and capricious and in its determination that the plaintiffs are entitled to injunctive relief.

EXCEPTIONS OF NO CAUSE AND NO RIGHT OF ACTION
Defendant contends that the trial court erred in overruling its exceptions of no cause and no right of action. We find that the trial court correctly disposed of this issue and we are pleased to adopt as our own the trial judge's well written reasons in connection therewith.

"EXCEPTION OF NO CAUSE OF ACTION

The peremptory exception of no cause of action questions whether the law affords any remedy to the plaintiffs under the allegations of their petition. LSA-C. C.P. 927(4); Guillory v. Nicklas Oil & Gas Co., 315 So.2d 878 (3rd Cir., 1975). All well-pleaded facts must be accepted as true and any doubts must be resolved in favor of the sufficiency of the pleadings to state a cause of action. Landry v. Landry, 339 So.2d 360 (1st Cir., 1976) (sic) Although petitioners' allegations are based on federal law, this Court has concurrent jurisdiction with the federal courts in a NEPA dispute, and can adjudicate the issues between the parties since Congress has not given the federal courts exclusive jurisdiction. Testa v. Katt, 330 U.S. 386, 67 S.Ct. 810 [67 S.Ct. 810] (1947). A reading of the petition as a whole alleges sufficient facts that the conduct on the part of the defendant violates Public Law 91-190 of the United States government (NEPA). Therefore, since this Court has subject matter jurisdiction and the petitioners specifically allege a failure by the defendant to follow the NEPA requirements, which this Court has to accept as true for purposes of this exception, the exception of no *1070 cause of action be and is hereby overruled.

EXCEPTION OF NO RIGHT OF ACTION

Next, the Court will consider the exception of no right of action which raises the question of whether a remedy afforded by the law can be invoked by these plaintiffs. LSA-C.C.P. 927(5); Bamber Contractors, Inc. v. Henderson Bros., Inc., 345 So.2d 1212 (1st Cir., 1977). Concerned Citizens of Rapides Parish is an organization of 150 members. Mrs. Lorena Pospisil, one of the members, testified in her individual and organizational capacity, along with Terry Trimble and Stephanie Dufour, who testified as members of the organization. Mrs. Pospisil lives on the north side of the Red River, works on the south side, and makes deliveries for her business on both sides; Terry Trimble is an Alexandria city councilman, works for Cutter Laboratories and crosses the river frequently to make calls on three medical institutions on the north side of the river; Stephanie Dufour lives on the north side of the river and has been told by the State that because of the proposed project, the street where she resides will be repaved to within eight feet of her front door.

Article 681 of the Louisiana Code of Civil Procedure requires that for a party to bring an action, he must have a "real and actual interest which he asserts". The articles in the Code of Civil Procedure are to be liberally construed, and with due regard for the fact that rules of procedure implement the substantive law and are not an end in themselves. LSA-C.C.P. Article 5051.
The issue for this Court to determine is whether these plaintiffs have a `real and actual interest' in bringing this suit based upon a NEPA cause of action. Since the Louisiana state courts have not dealt with this area of the law, it is necessary to look to federal jurisprudence to decide what `real and actual interest' a plaintiff is required to have in a NEPA suit.

To establish a right of action to challenge an environmental impact statement (or the lack of one), plaintiffs must allege first that the challenged administrative action will cause them injury in fact, economic or otherwise, and secondly that their injury is arguably within the zone of interests protected by the National Environment Policy Act of 1969. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361 [31 L.Ed.2d 636] (1972). This `injury in fact' test for a right of action under NEPA is not limited to economic injury, but includes aesthetic and environmental injuries, Edwards v. First Bank of Dundee [D.C.], 393 F.Supp. 680 (1975), as well as the injurious effects on quality of life for city residents due to the effect of the project on vehicular and pedestrian traffic. Hanly v. Mitchell [2 Cir.], 460 F.2d 640 (1972).

Once a right of action under NEPA is invoked by a proper plaintiff, he may argue the public interest in support of his claim that the defendant has failed to comply with its statutory mandate. Also, it is clear that an organization whose members are injured may represent those members in a proceeding for judicial review. Sierra Club v. Morton, supra, [92 S.Ct.] page 1368.

These plaintiffs satisfy the `injury in fact' test of NEPA. Mrs. Pospisil's living standards will be adversely affected and injured by the proposed project because of time delays getting to and from work as well as for the deliveries for her business. The same is true for Mr. Trimble who travels on the north side of the river as well as Mrs. Dufour whose property will be affected by the proposed route of the bridge. Also, all plaintiffs testified that they had been adversely affected by traffic congestion around the Red River bridges this past winter due to one of the bridges being closed, and that such would also be true if there was another lift-style bridge built between the downtown areas of Alexandria-Pineville. This adverse effect will increase due to the construction of locks and dams and the impending reopening of the Red River for year-round *1071 barge navigation. The record clearly reflects that these plaintiffs will be adversely affected by the proposed project and the requisite `injury in fact' required by NEPA is present.

Finding that plaintiffs will suffer the required injury of NEPA, we must decide whether they fall within the zone of interests protected by the Act. Plaintiffs have a sufficient geographical nexus to the site of the challenged project that they will suffer whatever environmental consequences the project may have. This clearly places the plaintiffs within the ambit of NEPA's protection. Mansfield Area Citizens Group v. U.S. [D.C.], 413 F.Supp. 810 (1976); Conservation Law Foundation Rhode Island v. General Services Administration [D.C.], 427 F.Supp. 1369 (1977).

The Court is cognizant of cases in our state jurisprudence which prevent parties from litigating a cause which might pertain to the whole people in common. Such is not applicable here due to the federal right given to citizens of the United States under NEPA provided the citizens show the necessary real and actual interest in the subject matter in dispute.
Therefore, since this Court finds the potential for these plaintiffs to be injured by the proposed action and that these plaintiffs fall within the ambit of NEPA's protection, they have a `real and actual interest' in bringing this suit against the defendant, and, therefore, the defendant's exception of no right of action is overruled."

DID THE TRIAL COURT ERR IN GRANTING THE PRELIMINARY INJUNCTION SOUGHT BY PLAINTIFFS?
All parties agree that replacement of the "Murray Street" bridge is a major project which requires compliance with NEPA. The disagreement arises with respect to whether or not this project will have a significant effect upon the quality of the human environment. Under the provisions of NEPA if a major federally funded project will have a significant effect upon the quality of the human environment the appropriate agency must prepare and file an Environmental Impact Statement (EIS) in accordance with the provisions of 42 U.S.C. § 4332.[8] The DOTD in consultation with the FHA concluded, after considerable study, that the project in question would not have any reasonably foreseeable significant impact on the human environment and thus determined that a "Negative Declaration" would suffice in lieu of a detailed "Environmental Impact Statement". *1072 Plaintiffs contend otherwise and urged in the court below that an injunction should issue preventing further steps until the provisions of NEPA are fully complied with. The trial court held for plaintiffs and defendant has appealed.
At the outset we observe that appellate review of the issuance by the trial court of a preliminary injunction is limited. The issuance of a preliminary injunction addresses itself to the sound discretion of the trial court and is subject to reversal only if it be shown that such discretion has been abused or improvidently exercised. Schwegmann Bros. G. S. Markets v. Louisiana Milk Commission, 290 So.2d 312 (La. 1974); Particle Data Laboratories, Inc. v. Coulter Electronics, Inc., 420 F.2d 1174 (7th Cir. 1969).
Although the threshold determination of whether a major project will significantly affect the quality of the human environment is reserved to the agency, such determination is a proper subject for judicial review. In Save Our Ten Acres v. Kreger, 472 F.2d 463 (5 Cir. 1973), the U. S. Court of Appeals, 5th Circuit, considered the proper standard for judicial review of an agency's threshold determination not to file an EIS and concluded that to best effectuate NEPA the agency determination should be court-measured under a rule of reasonableness, rather than by the narrower standard of arbitrariness or capriciousness.
In Vermont Yankee Nuclear Power Corp. v. Natural Resource Defense Council, Inc., et al., 435 U.S. 516, 55 L.Ed.2d 460, 98 S.Ct. 1197 (1978) the United States Supreme Court, in considering the scope of judicial review of agency actions under NEPA, stated:
"... the role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review.

`Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.' Kleppe v. Sierra Club, 427 U.S. [390], at 410 n. 21, 96 S.Ct. [2718], at 2731 n. 21 [49 L.Ed.2d 576]."

. . . . .

"NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural. See 42 U.S.C. Sec. 4332. See also Aberdeen & Rockfish R. Co. v. SCRAP, 422 U.S. [289] at 319, 95 S.Ct. [2336], at 2355 [45 L.Ed.2d 191]. It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, Consolo v. FMC, 388 U.S. 607, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), not simply because the court is unhappy with the result reached..."
A perusal of the trial judge's written reasons reflects that he concluded that defendant failed to comply with NEPA based upon two salient factors: (1) the alleged inadequate study by the DOTD of the effect of projected bridge openings on the quality of the environment; and, (2) the alleged inadequate study and consideration by the DOTD of high-rise bridge alternatives.
Our review of the record in light of the settled principles set forth above prompts us to conclude that the trial court manifestly erred in its finding that the DOTD and the FHA failed to comply with the provisions of the National Environmental Policy Act.
The construction project under scrutiny is not one which will greatly change the surroundings in the area. It is merely a replacement bridge and is designed to substitute a new and modern facility for an antiquated and structurally unsound bridge. The latter facility will be torn down following completion of the new bridge which is *1073 to be located approximately 400 feet northwest from the existing bridge.
The determination of the trial court that the projected openings of the new bridge and the Fulton Street bridge will be of such frequency as to cause vehicular and pedestrian traffic to back up on both sides of the river resulting in noise and air pollution and traffic congestion on the bridge arteries and cross streets in downtown Alexandria and Pineville is not borne out in the record. Rather, this determination represents little more than the trial judge's own conclusion as to the effect of future bridge openings.
A letter from the United States Coast Guard dated June 4, 1979, filed in evidence by plaintiffs as Exhibit CC-13, reflects the following with regard to projected openings:

"My staff has analyzed the New Orleans District Corps of Engineers' projection of tow usage on the Red River for the years 1985 through 2035 at ten year intervals. Our analysis revealed that land traffic crossing the proposed bridge would not experience unreasonable delays as a result of operating the draw-span for tows. Based on the Corps projection that 20 percent of the tows would require opening of the draw, our analysis revealed that 20 openings a month or .6 per day would be required in 1985; 89 a month or 2.96 a day in 2005; 234 a month or 7.8 a day in 2035. We also calculated that the total time for operating the draw and the time an average six-barge tow could transit the bridge would be approximately 8 to 20 minutes."[9]
These calculations admittedly do not take into consideration the proposal of the Corps of Engineers to raise the pool stage of the Red River from 58' to 64' and the opening of the river to Shreveport, Louisiana, and possibly Daingerfield, Texas. This possibility was not considered by the DOTD in its initial studies because the Department did not become aware of the Corps proposal until early June of 1980. However, after this information became known, the DOTD and the FHA studied the possible effect of the proposed change and came to the conclusion that such change would not be of such significance as to change their opinion concerning going forward with the semi-high level, vertical lift bridge.
These later studies revealed that at pool stage 64' the proposed bridge would be required to open for 64% of the barge traffic. The following analysis by the Corps of Engineers prepared in May of 1980 reflects the anticipated tows monthly with River Reach Up to Shreveport, Louisiana, and with River Reach Up to Shreveport, Louisiana, and Daingerfield, Texas:

Year Tows/Monthly, Tows/Monthly,
 With River Reach Up With River Reaches,
 to Shreveport, LA Shreveport, LA and
 Only in Place Daingerfield, TX, in Place
---- ------------------- --------------------------
1988 135 135
1990 151 296
1995 183 338
2005 256 436
2015 349 554
2025 475 713
2035 646 913
2037 680 953

Considering the above analysis it is seen that in the year 2005 with River Reach Up to Shreveport, Louisiana, there would be approximately five openings per day and with River Reach Up to Daingerfield, Texas there would be approximately nine openings per day. Defendant's experts all testified that the number of openings anticipated as a result of such analysis is extremely low. There testimony in this regard is corroborated by reference to a "Summary of Navigation Openings-Movable Bridges 1979" which was introduced in evidence as D-33.
We observe that although the responsible agencies did give consideration to this proposed change in the pool stage of the Red River, the record reflects that such proposal is only in its planning stages. There is no certainty that the pool stage of the Red River will be raised or that the river will be opened for barge traffic to Shreveport, Louisiana or Daingerfield, Texas. In this *1074 latter connection we note that the "Tow Analysis" dated May 1980 submitted by the Corps of Engineers and introduced in evidence as D-27 contains the following pertinent comment:

"Evaluation of the number of tows passing the proposed US 165 bridge in the years 1988-2037 is presented in two columns. One with the navigation project in place to Shreveport, Louisiana, and one with the navigation project in place through Shreveport to Daingerfield, Texas. Our past economic analysis indicates that navigation to Daingerfield is not economically justified, but we are reevaluating this reach at this time." (Emphasis ours)

In our view the trial court erred in its heavy reliance on this possibility in concluding that the environmental studies of the DOTD were inadequate. As stated by the U. S. Supreme Court in ICC v. Jersey City, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944):
"Administrative consideration of evidence... always creates a gap between the time the record is closed and the time the administrative decision is promulgated (and, we might add, the time the decision is judicially reviewed).... If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening."
In Vt. Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., et al., supra, the court stated:
"We have also made it clear that the role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review."
Suffice it to say that the record reflects that the DOTD in consultation with the FHA took a "hard look" (State of California v. Bergland, D.C., 483 F.Supp. 465) at the consequences related to projected bridge openings and reached the conclusion that such openings would have no significant impact on air pollution, traffic congestion and other environmental considerations. It is true that representatives of both agencies readily admitted that no specific study was made of the loss to employers and employees in time and money which might be occasioned by projected bridge openings, however, we attach no particular significance to this alleged inadequacy. As stated in County of Suffolk v. Secretary of the Interior, 562 F.2d 1368, (U. S. Court of Appeals 2nd Cir., 1977):
"In making such a determination a court is governed by the `rule of reason', under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action, but will be upheld as adequate if it has been compiled in good faith and set forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action as well as to make a reasoned choice between alternatives."
Nor can we agree with the learned trial judge's finding that the studies made by DOTD of bridge design alternatives was inadequate.
The trial judge in his written reasons alludes to the fact that from the beginning of the project the defendant only considered building a lift-style bridge. The record confirms this fact to be true however, in sum, the testimony of the bridge design engineers was to the effect that in their judgment this particular type facility was best suited to the environment and would better serve the traffic needs in the area. In this connection Mr. David Huval, the bridge design engineer for the DOTD, testified as follows:

"I think, Mr. Roy, what you have to realize and I think the point that I can't sell to you and I can't seem to sell to the *1075 people of Alexandria at the time I presented this on four occasions, was the fact that Murray Street as it exists now is a land service facility.... It serves the basic downtown areas of Alexandria and Pineville. The downtown areas. Land services. It has no other real and I think the O & D studies that we made shows this, that the traffic was primarily from the railroad across into downtown Pineville and from Pineville, the railroad side and cross. This was represented, I don't recall the exact facts, but 80% of the whole traffic on the bridge was basically the downtown areas of both cities."

In spite of the original conclusion that a semi-high-lift style bridge would best serve the needs of the people and that such design would have no substantial impact on the quality of the environment, the DOTD in response to the requests of various citizens, who at public hearings expressed the need for a high-rise bridge, engaged Palmer and Baker to study and consider the feasibility of a high-rise bridge at various locations. It is clear from the record, particularly the testimony of Mr. David Huval, the bridge design engineer for the DOTD, and Messrs. Hammill and Roberson, consulting engineers for Palmer and Baker, that several high-rise bridge alternatives were considered. In studying these various high-rise alternatives engineering consideration was given to the effect that the touchdown point of the bridge would have upon the closure of streets, existing traffic patterns, aesthetic and other environmental considerations. With these considerations in mind the studies were conducted with the constraint that the touchdown point should not extend beyond Main Street.
The DOTD and Palmer and Baker after considerable study concluded that a high-rise bridge with a touchdown at Jackson Street (scheme 1) was unacceptable because of its failure to comply with proper engineering standards. The responsible agencies did not consider the feasibility of a high-rise bridge with a touchdown point beyond Main Street because, in their judgment, the required touchdown point would penetrate too far into the city causing closure of streets, disruption of existing traffic patterns etc. Able counsel for plaintiff sought by extensive cross-examination of the defendant's experts, to demonstrate that it would be possible to construct a high-rise bridge in the area. All of the experts agreed that if the touchdown point were moved away from the river beyond Main Street that construction of a high-rise bridge would be possible. However, they all agreed that such a high-rise facility would penetrate the city well beyond Main Street. The trial judge concluded that because no alternatives were studied with a touchdown point beyond Main Street a thorough and complete study of bridge alternatives was not made and thus the DOTD violated the provisions of NEPA. We cannot agree.
The fact that agencies charged with the responsibility of complying with NEPA do not consider every possible alternative, whether practical or not, is not a basis for a finding of non-compliance. As stated by the court in Vt. Yankee Nuclear Power v. Natural Resources Defense Council, Inc., et al., supra:
"Common sense also teaches us that the `detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved."
In the instant case for the reasons previously stated the agencies involved did not consider as a viable alternative, a high-rise bridge which would penetrate the City of Alexandria beyond Main Street. We are not prepared to substitute our judgment in this regard for that of the administrative agency. It is well settled that considerable latitude must be allowed to public agencies to perform the functions delegated to them under the law and that the courts should *1076 not intervene unless such conduct is clearly unreasonable and arbitrary. Acadian Officer Center, Inc. v. State Department of Highways, 307 So.2d 137 (La.App.1st Cir. 1974, writ refused).
For the above and foregoing reasons the judgment of the trial court granting a preliminary injunction enjoining and restraining the Honorable Paul Hardy, Secretary of the Louisiana Department of Transportation and Development, its agents, servants and all persons acting in concert with him, from taking any further steps in connection with Project No. 700-08-69, is reversed and set aside and plaintiffs' demand for a preliminary injunction is denied. This matter is remanded to the trial court for further proceedings consistent with the views expressed herein and in accordance with law. Costs of all proceedings in this court are taxed to plaintiffs-appellees. All other costs are to await a final determination of this matter.
REVERSED AND REMANDED.
LABORDE, J., dissents and assigns reasons.
LABORDE, Judge, dissenting.
The majority opinion condones the DOTD's violation of both the spirit and the letter of the National Environmental Policy Act (NEPA). For that reason, more fully explained as follows, I respectfully dissent.
NEPA is dichotomized, one branch setting forth its broad substantive policies and objectives; the other setting forth its important procedural requirements. For a more graphic view of this dichotomy, I quote from Scherr v. Volpe, 466 F.2d 1027 (7th Cir. 1972) wherein the court stated:
"The broad substantive policies and objectives of NEPA are contained in § 101 thereof. There the Congress expressed its basic goal that the federal government should strive for the protection of environmental values. Environmental protection was not established as an exclusive goal, rather the Congress restructured priorities in such a way that the ecological consequences of a federal action must now be given consideration. Thus § 101(b) of NEPA provides that "it is the continuing responsibility of the Federal Government to use all practical means, consistent with other essential considerations of national policy," to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," to attain "an environment without degradation", to "preserve important historic, cultural, and natural aspects of our national heritage," and to insure that "each person should enjoy a healthful environment."
The method by which the national goals would be achieved was left undefined in Section 101. However, Congress did not simply provide us with a promise incapable of realization. Important and much less flexible procedural requirements designed to insure that federal officials meet the sweeping Congressional commitment to the environment are contained in Section 102 of NEPA. The pertinent portions of Section 102 read as follows:
"The Congress authorizes and directs that, to the fullest extent possible: ... (2) all agencies of the Federal Government shall
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible federal official on
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*1077 Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, [United States Code] and shall accompany the proposal through the existing agency review processes;" [emphasis supplied].
Through the enactment of these procedural requirements the Congress has not only permitted but has compelled the responsible federal agencies to take environmental values into account. See Calvert Cliffs' Coord. Com. v. United States Atomic Energy Com'n., 449 F.2d 1109, 1112 (D.C.Cir. 1971). Not only must the environmental consequences of a particular action be considered, but Section 102 requires also that these consequences be weighed and balanced against other considerations, such as financial or social, which may be involved.
The environmental impact statement required by Section 102 is designed to insure that this balancing analysis is given its fullest effect. Pro forma compliance with the substantive guidelines of Section 101 simply will not suffice. Section 102 of NEPA provides that its procedures be implemented and carried out "to the fullest extent possible." Thus the somewhat flexible and general guidelines articulated in Section 101 are not to be found in its companion Section 102. Absent a conflict of statutory authority,1 the responsible federal officials must give full consideration to the environmental consequences of a major federal action significantly affecting the environment. The procedural steps outlined in Section 102 apply notwithstanding considerations of administrative difficulty, delay or economic cost. Calvert Cliffs' Coord. Com. v. United States Atomic Energy Com'n, 449 F.2d 1109, 1115 (D.C.Cir. 1971)"
Thus the law is that the requirements of § 102(2)(C) of NEPA apply to a proposed action if that action significantly affects the quality of the human environment. The narrow issue on appeal then is whether the proposed construction of a draw bridge connecting downtown Alexandria to downtown Pineville is a project which significantly affects the quality of the human environment and hence one where an Environmental Impact Study (EIS) is, by NEPA's express terms, mandated.
The criteria for determining whether a major project "significantly affects the environment" include, among others, highly controversial projects and disruption of an established community or planned development. In the trial court's findings of fact, which I strongly feel are correct, the court stated that:
"Any lift-style bridge built over the Red River in Rapides Parish will create a complexity of environmental problems because of the unique geography of the parish. Rapides Parish is in the middle of the state with many major state and federal highways intersecting here. The river divides the parish in two parts, a north and south side. On the north side is a Veterans Administration Hospital, Huey P. Long Memorial Hospital, Central Louisiana State Hospital, Pinecrest State School, the airport for the Central Louisiana area, and many of the major industries of the parish, all of which draw their workforce from both sides of the river. On the south side is Alexandria with major state and federal highway interchanges, two major medical institutions, the only ambulance service for the parish, and the Louisiana State Police, Troop E. Also geographically significant on the Alexandria side is the short city blocks in downtown Alexandria with the three streets closest to the riverMain, Third and Fourthrunning parallel to the river and all intersecting Jackson Street and Fulton Street.

*1078 Further, the Red River is scheduled to be opened for greater river navigation up to Shreveport, Louisiana and possibly Daingerfield, Texas. The port for the Alexandria-Pineville area is to be located in an area north and upstream of the present Fulton bridge and the proposed Jackson Street bridge. The present pool stage planned for this area is fifty-eight feet, but the U. S. Corps of Engineers is presently conducting public meetings to raise this elevation to sixty-four feet (CC-18). The fifty-eight foot pool stage would require the proposed bridge to open for twenty seven per cent of the barge traffic while the sixty-four foot pool stage would require openings for sixty-four per cent of the barge traffic.
At present there is one high-rise bridge located outside the city limits of Alexandria and Pineville (O. K. Allen) and two low-level bridges approximately two thousand feet apart connecting the two downtown areas. One of the low-level bridges is the Alexander Fulton bridge, built in 1964, which connects Fulton Street in Alexandria to the Pineville Expressway in Pineville. The second bridge is that sought to be replaced, the Murray Street bridge, built in 1902 and in dangerous condition, which connects Murray Street in Alexandria with Main Street in Pineville."
Based upon the law and the evidence reviewed concerning whether the NEPA requirements were followed, the District Court also made these additional findings of fact:
"As proposed, downtown Alexandria-Pineville will be served by two lift-style bridges approximately two thousand feet apart with minimum heights of ninety nine feet and one hundred four feet. Due to the heights' similarity and the proximity of the bridges, one must reason that bridge openings could affect both bridges at the same time. Projected openings of the proposed bridge will entail at least eight to twenty minutes per opening. The older Fulton structure will require a longer time. Vehicular and pedestrian traffic will back up on both sides of the river resulting in noise and air pollution, traffic congestion on the bridge arteries and cross streets in downtown Alexandria and Pineville. The defendant admits it did not consider these factors important. This Court disagrees. These are significant factors affecting the human environment and must be studied.
There was no study made of the lost time of employees commuting to either side of the river. Because of the unique geography of the metropolitan area as previously described, this is an important factor to consider and should have been studied. The only economic study made was road-user costs or the cost of a commuter travelling from a closed bridge to an open bridge. If the defendant's engineers had studied the geography of the area along with the close proximity of the proposed structure to the present Fulton bridge, reason would require a more thorough origin and destination study than that made by the defendant.
The Department of Transportation and Development was presented in early June, 1980, with a Corps of Engineers' proposal that the proposed pool stage of the Red River will be raised from fifty-eight feet to sixty-four feet. The original Corps projection at the fifty-eight foot pool stage would require the proposed bridge to open for twenty per cent of the barge traffic. During the taking of evidence in this case, this was revised to twenty-seven per cent. At the sixty-four foot pool stage, now under consideration by the Corps, the proposed bridge would be required to open for sixty four per cent of the barge traffic, a two hundred twenty per cent increase in openings over the first projection. These revisions and proposed actions came after the preparation of the final Negative Declaration. The defendant studied this proposal and decided that, even with the pool stage at sixty-four feet and more bridge openings being required (at the Fulton bridge and proposed structure), the proposed structure would still not have a significant effect on the human environment. Such *1079 a conclusion, in light of the considerations hereinabove noted on traffic congestion, shows clearly that an inadequate study was made of the effect of this impact factor. A good faith effort was required of the State when confronted with this proposal and this Court rules that the State has failed in its duty."
The Court then concluded:
"For the reasons outlined above, this Court finds that the reliance by the defendant on its Negative Declaration is unreasonable and not in compliance with the spirit and letter of the National Environmental Protection Act. The citizens of Alexandria and Pineville have a right to an in-depth study of this project because they, unlike the planners, will have to live with the results for the next fifty to one hundred years."
I am satisfied on this record and hence agree with the trial judge that the lift-style bridge project is one that has a significant impact on the quality of the human environment in that area. This is not to say that the environmental considerations outweigh the other considerations which attend the planning and construction of a bridge connecting the two downtowns here discussed. I decide only, and the record supports, that the project will have a significant impact on the environment and that the consequences to the environment should, as mandated by NEPA, receive the proper consideration by the officials involved.
Having concluded that an environmental impact statement is mandated under the facts and circumstances here presented, I think it relevant to discuss for a moment the harms caused by the DOTD's failure to file the EIS in this instance.
For one, NEPA requires that part of its detailed statement be devoted to "alternatives to the proposed action...." 42 U.S.C. 4332(C). In addition, agencies are commanded to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. 4332(E).
This duty to discuss alternatives has been described as the "lynch pin" of the entire impact statement. Natural Resources Defense Council v. Callaway (2d Cir. 1975) 524 F.2d 79, 92, quoting Monroe County Conservation Society, Inc. v. Volpe (2d Cir. 1972) 472 F.2d 693, 697-98. This duty is even more important where as here, the proposed action forecloses future consideration of an otherwise reasonable action or alternative i. e., a high rise bridge. At a minimum, the environmental impact of the foreclosed action or alternative must be assessed. Simply put, the DOTD should not be allowed to evade its duty.
Other harms were caused by the DOTD's failure to file an EIS. For example, since the proposed action was not disclosed in the EIS, the public was denied its procedurally provided opportunity to consider and respond to the lift-style bridge proposal. This denial offends the NEPA regulations which contemplate a reasonable opportunity for public and official comment. The whole purpose of an EIS is to disclose the issues. Warm Springs Dam Task Force v. Gribble (9th Cir. 1977) 565 F.2d 549, 554. It is especially offensive where as here the proposed project is highly controversial and of great impact.
On this same subject the record shows and the trial court found as a matter of fact the following:
"Local officials acquiesced in the lift-style bridge proposal in the early meetings because they were told by state and federal officials that funding was not available except for a lift-style bridge. The record reflects that funding for a high-rise bridge was available.
The Department of Transportation and Development operated under the faulty premise that the proposed bridge could not penetrate Main Street in Alexandria whereas the then Alexandria mayor and the commissioner of streets and parks in meetings with defendant and federal and highway officials offered to lower Main Street to have a high-rise bridge with a touchdown on the north end of Third *1080 Street. The record does not reflect that this proposal was ever studied or presented at any public hearing or included in the final Negative Declaration.
The consulting engineers, Palmer and Baker of Mobile, Alabama, substituted their judgment rather than considering that of local city officials on the effect of a bridge touchdown point past Main Street. Because of this error in judgment they did not conduct a thorough and competent study of the bridge alternatives available to the Alexandria-Pineville area, and make a fully informed recommendation to the defendant.
From the beginning of the project the defendant only considered building a lift-style bridge as shown by CC-1 (1975 environmental assessment) and the public was so informed at the 1975 corridor location hearing (CC-3, page 13) that funds were not available for a high-rise bridge. The State's original contract with Palmer and Baker was for a lift-style bridge. No high-rise alternative was presented at either public meeting, and only after much public clamor did the defendant consider it as an alternative, and when considered did not give it as much consideration as it did its earlier proposals (see CC-5) as NEPA requires. Such conduct by the defendant is hardly defensible and is evidence to this Court that it did not adequately study the high-rise alternative.
Further, the public views at the design public hearing (CC-4) held in August, 7, 1978, were not included in the final Negative Declaration (CC-5) as it was compiled and approved by the Federal Highway Administration on March 29, 1978, several months prior to the design hearing. This further shows that the defendant did not approach the design hearing with an open mind to evaluate the views to be expressed by the people of the Alexandria-Pineville area at the hearing as NEPA contemplates."
The result is inescapableby not testing its proposal via the channel of public comment and by not discharging its duties in good faith, the DOTD effectively undercut the goals of environmental impact statements; informed decisionmaking, and full disclosure.
In conclusion, Section 102 of NEPA mandates a particular sort of careful and informed decisionmaking process. This is to fulfill NEPA's design to insure that the government closely examine the environmental effect of its program and disclose to the public, the factual and analytical basis of its decisions. If the decision was reached procedurally without individualized consideration and balancing of environmental factorsconducted in good faithit is our duty, role, and responsibility to reverse. In this case, the DOTD failed to meet these procedural mandates. The DOTD is a product of the lawit has no legitimate power save that given to it by the law. When it fails to comply with the law, it is acting ultra viresbeyond its power. When an agency acts beyond its power, then the courts must perform their duty, which is to require the agency to comply with the law. The trial court discharged its duty by enjoining the DOTD from proceeding with the lift-style bridge until it has complied with the NEPA mandates. I would do likewise.
For the above and foregoing reasons, I respectfully dissent.
NOTES
[1] According to the record the unincorporated association known as "Concerned Citizens of Rapides Parish" was later incorporated as "Concerned Citizens of CENLA Inc. The corporation has not been made a party to this proceeding.
[2] The existing "Murray Street" bridge was constructed in the year 1902. According to the record this facility is a narrow two-lane bridge with heavy daily traffic. The bridge, and its present day condition, is considered hazardous to the traveling public.
[3] Plaintiffs allege and the trial court found that local officials acquiesced in the lift-style bridge proposal in these early meetings because they were informed by state and federal officials that funding was not available for a high-rise facility.
[4] All parties agree that the replacement of the Murray Street bridge is a "major action" which requires compliance with the National Environmental Policy Act.
[5] A "Corridor Location Hearing" is a hearing held before the route location is approved.
[6] Scheme 1 called for two twenty-four degree curves on an eight percent grade, which would require a ten per cent super elevation, a condition considered by the bridge design engineers to be totally unacceptable.
[7] The proposed bridge will be a 300-foot vertical-life bridge providing a minimum of 240 feet of horizontal clearance between faces of piers. The bridge is to be 104 feet in height and provides, considering a normal pool stage of 58' for the Red River, vertical clearance of 46 feet.
[8] 42 U.S.C. § 4332 provides in pertinent part as follows:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall
* * * * * *
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;"
[9] The evidence at trial reflects that a pool stage of 58' would require the proposed bridge to open for 27% of the barge traffic.