**CONSERVATION LAW FOUNDATION OF RHODE ISLAND et al.**

v.

**GENERAL SERVICES ADMINISTRATION et al.**

**Civ. A. No. 77–0015.**

United States District Court,
D. Rhode Island.

March 14, 1977.

Sister Arlene Violet, Harold R. Ward, Providence, R. I., for plaintiffs.

Lincoln C. Almond, U. S. Atty., R. I., Everett Sammartino, Asst. U. S. Atty., R. I., Providence, R. I., for defendants.

Dennis J. Roberts, Dennis J. Roberts, 2nd, Providence, R. I., for intervenor Derecktor.

## OPINION

PETTINE, Chief Judge.

This is an action against the named defendants for injunctive and declaratory relief. The plaintiffs contend that the federal defendants have disposed of or intend to dispose of certain parcels of naval surplus land and buildings in Rhode Island in violation of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 to 4347 (1970), and certain guidelines and regulations implementing NEPA, promulgated by the Council on Environmental Quality (CEQ), 40 C.F.R. § 1500.1 to .14 (1976); by the General Services Administration (GSA), 40 Fed.Reg. 15131 (April 4, 1975); and by the Department of Defense (DOD), 39 Fed. Reg. 14699 (April 24, 1974).

A temporary restraining order was issued on January 7, 1977, restraining the defendants from selling, disposing, leasing or otherwise encumbering any of the subject property pending a hearing on plaintiffs' motion for a preliminary injunction.

State of Rhode Island, Rhode Island Port Authority and Economic Development Corporation (RIPAEDC), Robert E. Derecktor, of Rhode Island, Inc., and Bend, Inc. are

intervenors. However, the intervention of Derecktor is limited to the disposal of a parcel known as Coddington Cove, and the intervention of Bend is limited to the parcel known as Coggeshall Point, neither of which, by agreement of the parties at the time of this hearing, are to be considered in this law suit.[1]

## FINDINGS OF FACT

The subject of this law suit is that government property which comprised all or part of the naval installations located in Rhode Island known as Quonset Point Naval Air Station (Quonset Point), Davisville Construction Battalion Center (Davisville), and Newport Naval Base (NNB), totalling approximately 4,000 acres.[2] On April 17, 1973, and October 19, 1973, the DOD announced that Quonset Point would be closed and that the operations at Davisville and NNB would be substantially reduced.

In June of 1974, DOD declared certain of this property to be excess and, shortly thereafter, it was declared surplus property available for disposition pursuant to the provisions of the Federal Property and Administrative Services Act of 1949 (FPAS), 40 U.S.C. §§ 471 to 524 (1970).

The areas in question are on two opposite shores of Narragansett Bay. On the west side there is the Quonset Point/Davisville section encompassing certain industrial and housing areas; on the east shore there is the Newport Naval Base which includes the Newport Industrial area and Fort Adams— Brenton Village.

On April 23, 1974, the State entered into an agreement (termed Protection and Maintenance Agreement) with the federal defendants whereby the State was authorized to "license out" these areas with the ap-

1. Other parcels known as New Wickford and Navy I, are part of the surplus property but need not be considered since the parties have agreed that these areas be excluded from the present suit. There is also, as part of this surplus, the Melville Ponds area, so called, which has been transferred to the Department of the Interior and is no longer considered surplus. It is therefore excluded from the Court's consideration.

In the course of the hearing, the plaintiffs also removed from this lawsuit the Electric Boat Co., located at Quonset Point, which is a licensee employing approximately 5,000 persons in a submarine building operation.

2. The 4,000 acres include the parcels identified in note 1, *supra.*

proval of both GSA and DOD. These licenses are terminable by either party upon 30 days written notice. Licenses were issued to various industrial and commercial businesses. As of the date of this law suit, fifty-seven licenses have been issued, twenty-five to oil-related companies and the balance to other types of enterprises. No environmental assessment has been prepared for the granting of any of these licenses.

By way of general background, it should be noted that when these naval operations were curtailed in this State, the curtailment carried in its wake the loss of more than 5,900 jobs and the withdrawal from Rhode Island of 17,000 Navy personnel and their families with a resultant loss of a cash flow of millions of dollars and a reduction of six percent in the Gross State Product. The State, in an effort to recover, prepared a general plan for the reuse of the surplus land and entered into the Protection and Maintenance Agreement with the Navy as an interim measure.[3]

In addition, the State established by legislation the Rhode Island Port Authority and Economic Development Corporation, which is now charged with the State's responsibility under the Protection and Maintenance Agreement.

Though RIPAEDC has pressed for the issuance of the present licenses, it has also adopted a policy specifically providing that when it came time to consider long-term leases, all licensees would be reviewed equally without favoritism and priority or to the exclusion of other rental prospects.

These present short-term licenses, issued by RIPAEDC, are particularly attractive to companies interested in the exploration and development of off-shore drilling for oil. The oil industry, because of the risks involved during the exploration phase, desire only temporary onshore support facilities both as to physical arrangements and legal obligations. As one oil company representative stated, the companies could not justify capital improvements or long-term lease obligations until the true off-shore oil potential and its location are determined. It is not known if the off-shore area known as the Outer Continental Shelf (OCS) will produce sufficient oil and natural gas as to warrant full commercial development.

At most, the activities of the oil companies, at this stage, are confined to offices, warehousing, storage and transportation. The oil companies use Davisville as a storage and shipping point for casings, drilling pipes and tools, food for crews on the oil rigs, ship supplies, drilling mud, and fuel for both the oil rigs and the workboats. It is estimated that peak employment for all oil-related licensee for the next two years will approximate 200–250 persons.

The defendants have further established that if they are not permitted to continue issuing licenses to oil-related industries, it will create a climate of hostility toward such industry and will cause the companies to go to other New England states. IMCO Services, one of the present licensees, has been offered onshore sites in Maine, Massachusetts, Connecticut, Delaware, and New Jersey.

Presently, the revenue from oil industry licenses aggregates $330,000 annually. It is argued that if this Court should grant an injunction barring the renewal of the present licenses and the issuance of future licenses, it will substantially reduce "the funds available to the Port Authority for the protection and maintenance of buildings which, given the circumstances at Quonset Point/Davisville, will deteriorate but for the continued availability of funds, for example, for the purpose of providing heat." The Court accepts this prediction as accurate.

## ISSUES

The issues before the Court have been narrowed considerably by agreement of the parties.

---

**3.** It is the State's ultimate aim to acquire this land from the Federal Government. The Protection and Maintenance Agreement provides for the protection, maintenance, and management of the facilities by the State of Rhode Island as well as the issuance of the licenses that are the subject of this suit.

The government agrees that it will prepare a cumulative environmental impact statement for all the areas in question excepting Fort Adams—Brenton Village and to defer sale or lease of any disputed land until the EIS is completed.

The plaintiffs agree to the continued issuance of short-term licenses so long as they are not oil-related and so long as no single industry becomes unduly concentrated.[4]

Thus, the only questions before the Court are:

1. Do the plaintiffs have standing?
2. Should the comprehensive EIS, which GSA has agreed to prepare, include the Fort Adams—Brenton Village area?
3. Should the State be permitted to continue issuing licenses to oil-related companies?

### *DO PLAINTIFFS HAVE STANDING?*

■ The "specific circumstances of individual situations" must be considered to resolve the problems of standing. *United States ex rel. Chapman v. Federal Power Commission*, 345 U.S. 153, 156, 73 S.Ct. 609, 97 L.Ed. 918 (1953). Over the years since *Chapman*, the Supreme Court has repeatedly spoken to this problem. Its later pronouncements in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1973) and *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), are dispositive of this issue in the factual setting of the present case.

In *Sierra Club* the Court stated, in holding the petitioner lacked standing to challenge the construction of a recreation area:

The trend of cases arising under the APA and other statutes authorizing judicial review of federal agency action has been toward recognizing that injuries other than economic harm are sufficient to bring a person within the meaning of the statutory language, and toward discard-

ing the notion that an injury that is widely shared is ipso facto, not an injury sufficient to provide the basis for judicial review. We noted this development with approval in [*Association of Data Processing Service Organizations Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184] in saying that the interest alleged to have been injured 'may reflect "aesthetic, conservational, and recreational" as well as economic values.' But broadening the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury. 405 U.S. at 738, 92 S.Ct. at 1367–68.

The Sierra Club failed to gain standing because it "failed to allege that it or its members would be affected in any of their activities or pastimes by the . . . development. Nowhere in the pleadings or affidavits did the Club state that its members use [the site] for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." 405 U.S. at 735, 92 S.Ct. at 1366.

In *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the Court said one "injured in fact", had a stake in the outcome, and consequently standing, even though his or her injury might be small, even though only deprivation of use and enjoyment of natural resources was alleged, and even though the injury was suffered in common with many other persons. *See id.* at 686, 688–90 & n. 14, 93 S.Ct. 2405.

■ The factual infirmities of *Sierra Club* do not exist here. The plaintiffs have alleged, and indeed, the government has agreed that individual members of the plaintiff organization live in and/or use the surrounding area and use Narragansett Bay for recreational purposes. There is an un-

---

**4.** Plaintiffs have not shown that there is any present danger of "undue concentration" of licenses in any other type of activity besides oil. Accordingly, there is at present no factual basis upon which injunctive relief against undue concentration of non-oil-related licenses can be granted and this prayer is not considered further in this opinion.

**1374**

disputable geographical nexus and proximity which cannot escape environmental consequences. *See City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975).

The plaintiffs have standing under § 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1970).

*Should Fort Adams—Brenton Village be included in the comprehensive environmental impact statement?*

■ The direction to be followed in resolving this contention is expounded in *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Kleppe holds that a comprehensive environmental impact statement is required by § 102(2)(c) of the National Environmental Policy Act, 42 U.S.C. § 4332(c) (1970), if the agency proposes a major federal action with respect to an entire region (clearly not the situation before the Court) or "when several proposals . . . will have cumulative or synergistic environmental impact upon a region . . . " *Id.* at 410, 96 S.Ct. at 2730.

*Kleppe* further holds that a high level of technical expertise is required to determine the region with respect to which a comprehensive statement is necessary; that such determination "is properly left to the informed discretion of the responsible federal agencies" and will not be disturbed absent a showing of arbitrary action. Finally, *Kleppe* is authority for the proposition that even in the face of a necessary comprehensive statement the agency may approve single projects before its completion. *Id.* at 414 n. 26, 96 S.Ct. 2718.

In the present case, the government has agreed to prepare a comprehensive EIS but plans to exclude Fort Adams/Brenton Village. However, it has stated that a separate environmental assessment will be prepared before disposing of it. Present plans call for the transfer of Fort Adams/Brenton Village to the State of Rhode Island for preservation as a historical site.

Conceding for the moment that there is, as plaintiffs argue, some interaction between the various parcels around the Bay; this Court cannot find that the agency's determination of the scope of the EIS is arbitrary. As stated, GSA has committed itself to the preparation of an environmental assessment. Furthermore, there is evidence that Fort Adams/Brenton Village as a historical and recreational area is environmentally independent from the other surplus sites in question and cannot be equated to the industrial uses discussed herein. At any rate, *Kleppe* establishes that GSA has the option to dispose of Fort Adams/Brenton Village separately, provided an assessment is made of the environmental consequences. If any transfer is made without such an assessment, judicial review is still open to the plaintiffs.

Fort Adams/Brenton Village need not be included in the comprehensive EIS.

*Should the State be permitted to continue issuing licenses to oil-related companies?*

The litigants do not dispute that we do have here a "major Federal actions significantly affecting the quality of the human environment" within the meaning of § 102(2)(c) of NEPA, 42 U.S.C. § 4332(2)(c), which requires the preparation of an EIS.

Unlike the situation before the Court in *Rhode Island Committee on Energy v. General Services Administration*, 397 F.Supp. 41 (D.R.I.1975), all parties agree the time is now ripe for an EIS.

The only real dispute among the parties is over whether the defendants should be permitted to renew the existing interim oil-related licenses for the Quonset/Davisville area and grant new ones while the EIS is in preparation.

■ The Court has no doubt, and the United States has never disputed, that the regulation of GSA, *see* 40 Fed.Reg. 15131 (April 4, 1975), and of DOD, *see* 39 Fed.Reg. 14699 (April 26, 1974), require those agencies, before granting or approving licenses of the type at issue here, to prepare an EIS or an environmental assessment of reasons why an EIS is not required. Nor is there any contention that the federal defendants have complied with these regulations, which

have the force of law, *see Hiram Clarke Civic Club v. Lynn,* 476 F.2d 421, 426 (5th Cir. 1973). Federal defendants are thus in violation of the procedural requirements of NEPA, 42 U.S.C. § 4332(C), insofar as they have issued licenses without preparing an EIS or a reasoned statement of why such a study is not required in each case.

Nevertheless, establishment of a NEPA violation is, in the familiar phrase, the beginning and not the end of this Court's inquiry. It remains to determine whether, given the violation, injunctive relief is appropriate.

Plaintiffs suggest that a NEPA violation by itself is sufficient predicate upon which to base an injunction against "further licensing of oil-related activities" pending completion of the comprehensive EIS. By "further licensing," plaintiffs have made it clear that they mean renewal of existing one-year licenses as well as the grant of licenses to new oil-related applicants.

Defendant intervenors contend that the traditional prerequisites to preliminary injunctive relief—probable success on the merits, irreparable harm to plaintiffs outweighing any harm to defendants, and advancement of the public interest—must be met before any injunction can issue.

■ The Court of Appeals for the First Circuit has addressed the question of remedies for non-compliance with NEPA in the recent case of *Essex County Preservation Association v. Campbell,* 536 F.2d 956, 962 (1976). Essex County holds that a district court may, in exceptional cases, grant a preliminary injunction to prevent procedural violations of NEPA, without rigorously insisting that plaintiffs demonstrate that defendants' NEPA violations will cause harm to the environment. Such a rule makes eminently good sense in NEPA cases, where "[t]he manner and timing of . . . application [of NEPA's procedural requirements] is crucial." *Lathan v. Volpe,* 455 F.2d 1111, 1116–17 (9th Cir. 1971). However, to hold, as does the *Essex County* court, that the district courts have wide powers to respond flexibly and effectively to the special problems presented by

NEPA cases, is not to say that the district courts are *required* to grant the extraordinary remedy of injunction whenever there is a NEPA violation, without the case by case assessment of each situation that is the traditional hallmark of courts of equity. See *Essex County Preservation Association v. Campbell,* 399 F.Supp. 208, 218 (D.Mass. 1975), *aff'd* 536 F.2d 956 (1st Cir. 1976).

■ Thus, the Court must consider the criteria for application of the Court's equitable powers in deciding whether a preliminary injunction should now issue. This involves the determination of whether or not the continued licensing of oil-related companies until such time as an EIS is prepared will adversely affect the environment or "thwart" the purposes of NEPA; that is, if licensing is continued for the next 18 months to 2 years, the earliest time within which an EIS can be prepared, will such substantial investments have been made by oil-related companies to the exclusion of other options so as to contaminate the decision-making process and render it difficult for the decision maker to consider fairly the environmental impact of oil-related industry? See *Scientists Institute for Public Information, Inc. v. Atomic Energy Commission,* 156 U.S.App.D.C. 395, 481 F.2d 1079, 1094 (1973).

To put it another way, will a concentration of oil interests create such a "climate of expectation" that it will discourage other potential users of the land, as well as potential users of adjacent parcels of land, from ever seriously considering locating there, thus irrevocably committing the land to oil-related uses? If such an irreversible position would result, then the plaintiffs have satisfied the requirement of showing irreparable harm.

I do not believe the present program of licensing etches so deeply as to delimit this land solely to the uses of the present and future oil-related licensees.

As this Court sees it, this is a situation which affords Rhode Island an opportunity to capitalize on a potential for economic growth without succumbing to any unre-

strained commitment of resources to oil-related uses which will restrict other government options.

It is important to consider the terms of the licenses involved and the scope of the activity of the licensees. As previously stated, the land is committed to those businesses for only 30 days; that is, licenses can be terminated on 30 days' notice from either party. Secondly, it is uncontroverted that the exploration companies require and only desire at this time onshore facilities which are temporary since, as argued, they could not justify incurring long-term lease obligations or making capital improvements at any particular site until it becomes clear that commercial quantities of oil will be found on the OCS. And as the testimony discloses, this will not take place, if at all, until two to three years from now. As I interpret the evidence, the level of activity for the next several years will have no appreciable impact on the environment. In short, there is no proof that there is any danger of significant environmental harm; nor does the Court see a narrowing of realistic choices by permitting the defendants to continue their practice of issuing the present licenses. By the time the choice is to be made—if oil is found—the EIS should be completed and the commitment of the land to any use at that time will not be much different than it is today.

In reaching this conclusion the Court is quite aware that environmental management requires early action as Congress intended. This means that decision makers must face environmental problems " 'while they are still of manageable proportions and while alternative solutions are still available' rather than persist in environmental decisionmaking wherein 'policy is established by default and inaction' and environmental decisions 'continue to be made in small but steady increments' that perpetuate the mistakes of the past without being dealt with until 'they reach crisis proportions'." *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972), *citing S.Rep.* No. 91–296, 91st Cong., 1st Sess. at 5 (1969). But the evidence in this case simply does not support plaintiffs' contention that this type of administrative negligence has occurred here.

■ The interest balancing that the Court employs in the exercise of its equitable discretion must encompass the entirety of the facts before it in the particular case at bar. And though in NEPA cases economic factors are not controlling, they should not be ignored when they do no violence to the purposes of NEPA. In such situations, economic factors are legitimate considerations in arriving at what is essentially a political decision requiring that a broad spectrum of uses be evaluated before committing surplus land to an ultimate use. It is not for this Court to unnecessarily circumscribe this process. Premature injunctive action may well foreclose acceptable options to the detriment of the state's best interest. Should this Court stop all renewals and further issuance of licenses to oil-related companies until an EIS is completed, the inordinate delay may well cause these companies to leave Rhode Island, unlikely to return. When all is said and done, with all environmental factors considered, this very industry may ultimately prove to be the best choice. That is not for this Court to say. Nevertheless, the potential for the economic growth of this State should not be defeated by fettering the GSA and RIPAEDC in their present operation of the land in question.

Applying general principles of equity, I find the plaintiffs have not proven there exists a substantial threat that they will suffer irreparable injury if an injunction is not granted. *See State of Ohio ex rel. Brown v. Calloway,* 497 F.2d 1235 (6th Cir. 1974). On the other hand, to grant an injunction now requires the Court to disregard all the economic factors weighing so heavily in favor of the defendants; ignore the fact that the present activities at Quonset/Davisville offer no serious threat to the environment; overlook GSA's agreement to prepare a comprehensive EIS covering virtually all the surplus land involved in this litigation and the fact that since the hear-

ing in this case it has been publicly announced that funds have been allocated to complete the study in question within two years. Such an approach is illogical and violative of basic equitable concepts.

It is this Court's opinion and it so rules that an injunction against the issuance of short-term licenses is not proper and must be denied. Likewise, it does not appear appropriate to enjoin sale or lease of the disputed land pending completion of the comprehensive EIS, since GSA has agreed that it will voluntarily defer any such arrangements until after the EIS. The Court has no reason to doubt that GSA will do as it says.

### CONCLUSION

The Court emphasizes that what it decides today is no bar to further consideration if the level of activity markedly departs from the findings of fact recited herein.

Further delay in the preparation of an EIS can only unduly complicate the posture of this case. Such complications are obvious if commercially exploitable oil is discovered before completion of an EIS.

The Court, therefore, will retain jurisdiction pending final adjudication on the merits and hereby orders the government to submit progress reports as to the action it is taking to accomplish the comprehensive impact statement every eight months. The first report is to be submitted and filed as a public record with the Clerk of this Court by December 31, 1977. At each such interval, the plaintiffs may seek such judicial intervention and relief, if any, as lies within the authority of this Court under controlling statutory and decisional law.

The plaintiffs' application for a preliminary injunction is denied. An order will be prepared in keeping with this opinion.