**CONSERVATION LAW FOUNDATION OF NEW ENGLAND, INC., et al., Plaintiffs, Appellees,**

v.

**GENERAL SERVICES ADMINISTRATION, et al., Defendants, Appellants.**

No. 82–1861.

United States Court of Appeals, First Circuit.

Argued April 6, 1983.

Decided May 17, 1983.

628

* Of the District of Massachusetts, sitting by designation.

1. Those properties comprise part of three former United States naval installations in Rhode Island: the Quonset Point Naval Air Station, the Construction Battalion Center (Davisville) and the Newport Naval Base.

Peter R. Steenland, Jr., Atty., Dept. of Justice, Washington, D.C., with whom Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Paul F. Murray, U.S. Atty., Everett Sammartino, Asst. U.S. Atty., Providence, R.I., Dirk D. Snel, Lawrence R. Liebesman, and Martin Green, Atty., Dept. of Justice, Washington, D.C., were on brief, for defendants, appellants.

Steven D. Stark, Boston, Mass., with whom Kenneth T. Hoffman, Boston, Mass., was on brief, for plaintiffs, appellees.

Robert M. Sabel, Newport, R.I., with whom John W. Dineen, Providence, R.I., and Robert M. Dobbins, Newport, R.I., were on brief, for intervenors.

Before COFFIN and BOWNES, Circuit Judges, and TAURO,* District Judge.

COFFIN, Circuit Judge.

In this appeal we consider the interaction of two federal statutes—the Federal Property and Administrative Services of Act of 1949 ("FPAS"), 40 U.S.C. §§ 471 et seq. and the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 et seq. At issue are certain federally owned properties in Rhode Island,[1] formerly used as naval facilities, which the Department of Defense in 1974 declared excess to its needs and turned over to the General Services Administration ("GSA") for disposition pursuant to FPAS.[2] In 1977 the Conservation Law Foundation ("CLF")[3] and other environmental groups filed suit to enjoin the lease or sale of the properties until GSA had complied with NEPA. Shortly thereafter, GSA agreed to prepare an environmental impact statement ("EIS") and to defer sale or lease of any disputed parcels

2. The procedural history of this case is set out in more detail in the two district court opinions—*CLF of Rhode Island v. GSA,* 427 F.Supp. 1369 (D.R.I.1977) and *CLF of New England v. Kline,* 16 Env't Rep.Cas. 1985 (D.R.I.1981).

3. Suit was originally filed by CLF of Rhode Island. In May of 1981 CLF of New England was substituted as the lead plaintiff. The two organizations are separate and independent.

of land until after the completion of the EIS. In light of that agreement and finding no irreparable harm in the interim short-term licensing of certain properties,[4] the court denied plaintiffs' application for a preliminary injunction but retained jurisdiction. *CLF of Rhode Island v. GSA,* 427 F.Supp. 1369 (D.R.I.1977).

GSA released a final EIS ("FEIS") in November 1978. The FEIS concluded that, despite the potential environmental effects that it identified, most of the surplus land should be disposed of immediately.

"[A] definite need exists to dispose of the surplus properties on Narragansett Bay. GSA believes that not disposing of the properties could have more widespread and long term adverse effects than virtually any of the reuse schemes investigated as part of the EIS studies. Clearly, the adverse socioeconomic and psychological effects of Postponing the Action or taking No Action would be far greater than any possible adverse impacts resulting from surplus property reuse. Even though not disposing of the surplus properties would have some measure of environmental benefit, the largely idle properties could over time become an environmental liability, particularly from an aesthetic and historic perspective as the properties would deteriorate from a lack of capital improvement and productive use. While GSA recognizes that reuse of the surplus properties could result in some regionally significant environmental consequences, the agency strongly believes that the socioeconomic and psychological benefits of disposing of the surplus properties are well worth the risk of potential

environmental problems in the future." FEIS at I–24.

Plaintiffs contended that the FEIS was inadequate and that GSA had still not complied with NEPA.

In October 1980 GSA proposed to sell some of the lands to local communities pursuant to 40 U.S.C. § 484(e)(3)(H), to transfer other lands (to be used for recreational and park purposes) to local communities pursuant to 40 U.S.C. § 484(k)(2), and to sell at public sale pursuant to 40 U.S.C. §§ 484(e)(1) and (2) two tracts of land called Hoskins Park and Military Drive. By May 1981 when both parties moved for summary judgment, consent decrees had been reached with regard to much of the surplus property, and only seven parcels of land remained at issue.

During the course of the lawsuit a group of citizens in North Kingstown, Rhode Island, concerned over the fate of certain parcels of the surplus land containing abandoned housing and over the need for low cost housing in their community, organized an association known as Action to Save Quonset Abandoned Housing ("ASQAH").[5] By the time ASQAH moved to intervene in the lawsuit in December 1980, only two such parcels—Hoskins Park and Military Drive—remained in the lawsuit.[6] ASQAH's motion to intervene was granted in January 1981.

In seeking summary judgment plaintiff CLF contended below that the FEIS was inadequate because it did not analyze the environmental consequences of actual, site-specific plans for reuse of the surplus land submitted by prospective buyers. CLF argued further that NEPA requires GSA to consider environmental factors when choosing among prospective buyers.

---

**4.** GSA had reached an agreement with the State of Rhode Island whereby the state was authorized to license out certain areas of the surplus property to various industrial and commercial businesses, including oil-related companies. The licenses were terminable by either party upon 30 days written notice. *CLF of Rhode Island v. GSA, supra,* 427 F.Supp. at 1371–72.

**5.** Members of ASQAH have also formed a non-profit housing corporation, ASQAH Coopera-

tive, Inc., with the purpose of acquiring and developing the Hoskins Park and Military Drive parcels as cooperative housing for predominately low and moderate income families.

**6.** Two other housing parcels, Anchorage and Naval Gardens, remain in the lawsuit but have not been made a subject of the intervenor's claims. GSA intends to sell those parcels to Rhode Island towns pursuant to 40 U.S.C. § 484(e)(3)(H).

Plaintiff-intervenor ASQAH joined in those claims, focusing particularly on the Hoskins Park and Military Drive parcels. ASQAH contended that the FEIS failed to consider adequately the environmental impact of the public sale of those parcels, in particular the impact of such sale on the availability of low and moderate income housing. ASQAH argued in addition that the FEIS did not adequately consider the possibilities of disposing of the surplus housing areas through HUD pursuant to 40 U.S.C. § 484(b) or of disposing with restrictive covenants.

Finding that "Congress intended GSA to transfer surplus land to HUD only at HUD's request" and that no such request had been made, and that GSA has no power under FPAS, under the National Housing Act or elsewhere to sell property with restrictive covenants, the district court held that the FEIS was not deficient in failing to discuss alternative methods for disposing of the Military Drive and Hoskins Park parcels. *CLF of New England, Inc. v. Kline,* 16 Env't Rep.Cas. (BNA) 1985, 2000–2002 (D.R.I.1981). The court also held that because the public sale provisions of FPAS evince Congress's primary intent to obtain the most financially advantageous sale for the government, GSA is not required by NEPA to consider environmental factors in its initial choice of buyers once it has determined that property should be disposed of by public sale.

The court found, however, that the FEIS did not adequately analyze the environmental impact of disposal of individual parcels of the surplus land to permit a reasoned choice between retention or disposal of each parcel. *CLF v. Kline, supra,* 16 Env't Rep. Cas. at 1998–99. The court therefore ordered GSA to "incorporate in the FEIS enough site-specific environmental information to permit a reasoned disposal decision as to each parcel."

The court further held that, because NEPA requires an agency to continually gather relevant environmental information about its proposed actions, GSA "must obtain development plans from the party whose bid or private offer GSA plans to accept" and to supplement its FEIS in the event that "the development plans reveal that the prospective buyer intends to use the property in a manner significantly different from any potential use anticipated by the FEIS." *Id.* at 2002. The court reasoned that the primary purpose of FPAS sale provisions, to obtain the best possible financial deal for the government, conflicts with and therefore precludes NEPA requirements to the extent that GSA may not choose among buyers in the first instance on the basis of environmental factors and that there would therefore be no purpose in seeking development plans from all prospective buyers. But, relying on the FPAS proviso that "all bids [in a publicly advertised sale] may be rejected when it is in the public interest to do so", 40 U.S.C. § 484(e)(2)(C), the court concluded that NEPA does require GSA, "before actually transferring to the highest bidder or accepting the most advantageous private offer", to "weigh the potential environmental impact of the purchaser's development plans against financial advantage to the government and other indicia of 'public interest.' " *Id.* at 2003.

Based on its opinion, the court granted and denied in part the cross motions for summary judgment of each party and "enjoined [GSA] from selling or leasing the subject properties pending revision of the FEIS and its compliance with NEPA." GSA appeals. We face two questions: (1) Was the FEIS adequate to allow a reasoned choice as to retention or disposal of the land parcels remaining in the suit? (2) Does NEPA require GSA to obtain development plans from the prospective buyer whose bid or private offer it intends to accept and to supplement the FEIS if those development plans are significantly different than any potential use anticipated by the FEIS?

I. *Site-Specific Analysis*

Section 102 of NEPA requires federal agencies to

"include in every recommendation or report on proposals for legislation and other

major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C). GSA does not dispute that its disposal of 3200 acres of surplus property, FEIS at S–1, is a major federal action requiring the preparation of an EIS. It does contend, however, that the FEIS that it completed in November 1978 fulfills its obligations under NEPA. The essential question before us is whether that FEIS was sufficiently "detailed" within the meaning of § 102.

To analyze the environmental impact of disposing of the surplus properties, GSA divided the two major surplus areas—referred to as "Quonset Point/Davisville" and "Newport Naval Base"—into a number of subareas or parcels.[7] Seven such parcels are still at issue in this lawsuit.[8] Hoskins Park and Military Drive, the only parcels which GSA intends to put up for publicly advertised sale, are parcels in the Quonset Point/Davisville area. Hoskins Park is a tract of 86.68 acres with 102 buildings containing 333 housing units, and Military Drive is a tract of 37.9 Acres with 32 buildings containing 138 housing units. FEIS at S–13.

The FEIS plots three different schemes of hypothetical reuse of the surplus properties. In each of the three schemes each subarea is identified as devoted to a generic reuse, such as "heavy industry", "open space/conservation", "light industry/office/institutional", "recreation", "residential", etc. Those reuses are categorized as low, moderate, or high intensity. In each of the three schemes it is assumed that Hoskins Park and Military Drive will be reused residentially.

The FEIS analyzes environmental effects—including impacts on ecological and water resources; land form; air quality and noise levels; socioeconomic effects; open space and visual quality; and historical, architectural, cultural and archaeological resources—on a cumulative, regional basis with reference to specific anticipated land uses that are expected to have significant impacts. For example, effects on air quality resulting from each of the three hypothetical reuse schemes were assessed for the two major regions—Quonset Point/Davisville and Newport Naval Base—as a whole, not on a parcel by parcel basis. GSA contends in the introduction to the FEIS that such a cumulative approach is appropriate given its inability to control future use of the lands once it has disposed of them.

"The uncertainty over the ultimate use of the surplus properties dictates the generalized regional approach utilized in the FEIS. Information pertaining to land use related impacts is provided with particular emphasis on significant cumulative and regional effects, as is appropriate for a programmatic EIS. It is not the purpose of this EIS to satisfy the various Federal and State environmental requirements that would have to be complied with by recipients or purchasers of

**7.** Twenty-three parcels were identified in the Quonset Point/Davisville area; ten in the Newport Naval Base area. In addition, Prudence Island and Gould Island were evaluated separately.

**8.** The five remaining parcels in addition to Military Drive and Hoskins Park are: Lawton Brook and McCallister Point, which GSA in-

tends to transfer to the Department of the Interior who will in turn transfer them to two Rhode Island towns for use as park and recreation land pursuant to 40 U.S.C. § 484(k)(2); Old Wickford, consisting of unimproved land; and Anchorage and Naval Gardens, which GSA intends to sell to Rhode Island towns pursuant § 484(e)(3)(H).

the properties prior to their being able to implement their development and management proposals. Consequently, the FEIS is not at the level of detail normally associated with specific project oriented EIS's. Certain site-specific issues or concerns are not resolved in this EIS as these are more related to the specific implementation programs of parties who may acquire the surplus properties. The FEIS does, however, address regionally significant issues, factors that could play a role in the decision making process related to GSA's disposition responsibilities." FEIS at S–5.

In determining whether an EIS is sufficiently detailed to meet the mandates of NEPA, we, like other courts, have applied a "rule of reason". *See, e.g., Grazing Fields Farms v. Goldschmidt,* 626 F.2d 1068, 1074 (1st Cir.1980); *Commonwealth v. Andrus,* 594 F.2d 872, 884 (1st Cir.1979). Applying that standard in light of the purposes of the EIS requirement, *see, e.g., Silva v. Lynn,* 482 F.2d 1282, 1284–85 (1st Cir.1973) (articulating three purposes for "detailed statement" requirement), and in the context of GSA's limited powers under the FPAS, the district court concluded that GSA's speculative and cumulative approach was "reasonable" and that it would not be reasonable to require analysis of the environmental impacts of specific land reuse proposals. *CLF v. GSA, supra,* 16 Env't Rep.Ca. at 1997. Nonetheless, it found the FEIS inadequate to

"enable[ ] the decision making agency, members of the public, and other governmental agencies independently to evaluate the possible impact of federal action *as to individual surplus areas* and to make a *reasoned choice* as to whether disposal of *individual areas* is environmentally sound." *Id.* at 1999.

Thus, while recognizing that analysis of reuse must be speculative given GSA's inability to control reuse, the court held that in order to make a reasoned decision whether to retain or dispose of each individual parcel, that speculation must be meaningfully site-specific. To demonstrate the paucity of

site-specific analysis in the FEIS, the court examined such analysis as was directed to the Hoskins Park and Military Drive Parcels.

"The inadequacy of GSA's cumulative environmental analysis is apparent on its face. For example, the FEIS does inform the reader that the Hoskins Park and Military Drive areas will likely be used for housing once sold. The FEIS does describe the present condition of these housing areas and explains why their disposal through public sale is appropriate. However, the FEIS does not provide significant speculative data about the effect that use of these areas as residences will have on air quality, noise levels, marine life, terrestrial life, and other aspects of the physical environment in the immediate area in which the parcels are located. Apparently, all that the government discusses is the environmental effect of razing the abandoned housing areas. This alone is not sufficient. The parties' briefs and this Court's own reading of the FEIS have disclosed only scattered references as to the effect that demolition of unspecific abandoned housing will have . . . . These references do give some idea of the general consequences of disposal of these areas but not enough to permit an intelligent choice between disposal or retention of individual housing areas. Without site-specific information, it is impossible to determine whether disposal of each parcel might or might not cause disproportionate environmental harm.

The discussion in the FEIS of the impact of disposal on the Hoskins Park and Military Drive areas typifies the lack of even speculative environmental analysis done for *specific* parcels of property." *Id.* at 1999.

The scope of our review of a district court ruling concerning the adequacy of an EIS is limited; we will reverse only for "clear error". *See Concerned Citizens on I–190 v. Secretary of Transportation,* 641 F.2d 1, 3 (1st Cir.1981); *Cummington Preservation Committee v. Federal Aviation Administration,* 524 F.2d 241, 243 (1st Cir.1975). GSA makes essentially two arguments on ap-

peal:[9] (1) Because GSA cannot control reuse once land is transferred, any site-specific speculation about reuse is meaningless and a waste of agency resources; (2) Because the FEIS assumes that the parcels chiefly at issue—Hoskins Park and Military Drive—will remain residential areas, no significant environmental effects warranting EIS consideration would be brought about by the sale or other disposition of those parcels—"It is difficult to see ... what useful comments could be made in an EIS about the continuation of the status quo."

Both arguments beg the question. The first assumes that the land will be disposed of rather than retained. But that is the decision which GSA agrees can be made only after full consideration and publicity of environmental considerations. The fact that GSA cannot control the land once it is transferred is no reason not to take a hard look at whether the land should be sold. Such a hard look necessarily includes speculation about the consequences of sale, including speculation about likely reuses of the property.

The second argument assumes what can only be demonstrated by reasoned analysis: that no significant environmental effects will result from residential reuse of the parcels at issue. It is misleading to refer to such reuse as "the status quo". The housing on the Military Drive and Hoskins Park sites has been abandoned since 1973. Indeed, the FEIS assumes that the existing housing will be demolished. It is not apparent that residential development can proceed without major construction. Nor is it apparent what the environmental consequences of such construction will be. It is true that residential development may mean a number of different things—from multiple to single family dwellings designed for low income to wealthy dwellers—and that any assessment of environmental effects must speculate about a range of reuses. But this is the kind of speculation which is meaningful to the agency and to the public when assessing the wisdom of immediate sale of surplus land.

In requiring that GSA revise its FEIS to analyze in more detail the environmental effects of disposal of individual parcels of land, the district court did not, as GSA argues, require the preparation of a "hypothetical" EIS within the meaning of *Weinberger v. Catholic Action of Hawaii,* 454 U.S. 139, 145–46, 102 S.Ct. 197, 202–203, 70 L.Ed.2d 298 (1981) (Navy not required to prepare EIS regarding hazards of storing nuclear weapons at site in question when no evidence that such storage had been proposed). Here GSA does propose to dispose of surplus federal property, and the environmental consequences of that action are the proper subject of an EIS.

The only question here is whether GSA's already prepared FEIS is sufficiently detailed to meet the requirements of NEPA. We cannot say that the district court abused its discretion or was clearly in error in requiring more detailed analysis on a site-specific basis of the environmental consequences of disposing of those parcels of property still at issue in this suit. *Cf. NRDC v. Administrator,* 451 F.Supp. 1245, 1258–60 (D.D.C.1978) (necessity of following programmatic statements with site-specific statements); *NRDC v. Morton,* 388 F.Supp. 829 (D.D.C.1974) (same), *aff'd,* 527 F.2d 1386, *cert. denied sub nom Pacific Legal Foundation v. NRDC,* 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976); 40 C.F.R. 1502.20 (tiering of EIS).

In affirming the district court's order that GSA supplement its present FEIS with site-specific observation about environmental consequences, we do not envisage a major or time-consuming undertaking on the part of the agency. As the district court said, "GSA need only provide enough specific information about the consequences of disposal on individual parcels as to enable

---

9. GSA also contends, in its reply brief on appeal, that the FEIS is indeed "site-specific" and incorrectly characterized as "programmatic". But the FEIS itself characterizes its approach as "programmatic". *See* FEIS at S–5. Whatever labels one applies, the question is whether the FEIS is sufficiently detailed within the meaning of § 102 of NEPA.

GSA, the public and other agencies to make a reasoned choice as to whether or not to dispose of individual areas." *CLF v. Kline, supra,* 16 Env't Rep.Cas. at 1999. We note that the FEIS already provides some site-specific information, although not on a systematic basis. Such information, because speculative, cannot be exhaustive. The agency should, however, articulate a rationale for its assumptions about the probable reuses of the parcels remaining in the lawsuit and then specify the environmental effects of such probable reuses with particular attention to those with the most significant adverse environmental effects.[10]

■ Though seven parcels remain at issue in the lawsuit, the attention of all litigants in summary judgment proceedings as well as on appeal has focused on the Hoskins Park and Military Drive parcels,[11] the only parcels which GSA intends to put up for public sale. With regard to those parcels, the agency should begin by justifying its assumption that they will be reused for residential purposes and then identify the range of realistically possible residential reuses. It should then evaluate the environmental consequences of construction, provision of utilities, sewage, and road access, resulting automobile traffic, and other significant aspects of residential development for the most ecologically intensive of those reuses.

■ The agency need consider the environmental consequences of non-residential or mixed residential and non-residential reuses only if there is a significant possibility of such reuses. Site-specific supplementation of the FEIS with regard to the other five parcels remaining in the lawsuit, which GSA intends to transfer through the Department of the Interior or through direct sale to Rhode Island towns, *see* note 8 *supra,* may be minimal once GSA establishes that probable reuse of those parcels will be for parks and recreation or other ecologically non-intensive purposes.

■ Having completed a site-specific supplementation as outlined here, GSA will have complied with the procedural requirements of NEPA as we interpret them in this context. Because the supplement will necessarily be in terms of estimates of probabilities, no exhaustive detail is required. *Cf. Commonwealth v. Andrus,* 594 F.2d 872, 884 (1st Cir.1979) (court may not require degree of detail too exacting to be realized or consideration of alternatives too hypothetical or infeasible to meet serious consideration). Given good faith completion of this task, we would expect no substantial issues to remain.

This supplementation of the FEIS, though grounded in estimates of probabilities, will provide an appropriate context for GSA, other agencies, and the public to evaluate GSA's proposed sale of the Hoskins Park and Military Drive Parcels. Because no other agencies or public entities have shown interest in those parcels, GSA's choice at this stage is between retention and disposal through public sale, *see* FEIS at 27–28. In addition to informing the decision between retention and disposal, however, more careful consideration of the probable consequences of public sale of those parcels will give other agencies, public entities and community groups an opportunity to meaningfully consider acquisition.

## II. *Assessment of Development Plans*

The district court rejected the argument of plaintiffs below that, before selling land in a publicly advertised sale, GSA must analyze specific proposals for land use from prospective buyers. The court held that such analysis was unwarranted given GSA's inability to restrict future land use.

---

10. As the district court indicated, "GSA may focus on the same factors used in the present FEIS in structuring its supplementary analysis: ecological and water resources, land form, air quality and noise levels, socioeconomics, open space and visual quality, historic, architectural, cultural and archaeological resources." *CLF v. Kline, supra,* 16 Env't Rep.Cas. at 1999.

11. GSA's brief on appeal argues as if only those two parcels were subject to the district court's order. The district court's opinion makes it clear, however, that its order applies to all of the properties remaining in the lawsuit. *See id.* at 1998–99.

"Because GSA lacks authority to restrict the future use of surplus property, requiring GSA to analyze specific environmental impacts of specific proposals might be foolish. A particular buyer might change its development plans by the time an EIS were complete. Moreover, subsequent purchasers from the original GSA grantee might use the land in a manner not envisioned by GSA or the original buyer's development plans. In light of such possibilities, a proposal-specific EIS might well be a waste of federal funds.

. . . .

[W]here an agency is prohibited by statute from exercising ultimate control over use of land and serves merely to channel property efficiently and profitably to others whose later actions will directly affect the land, it is reasonable to require only a speculative EIS that permits an intelligent choice as to whether or not any disposal would be environmentally hazardous." *CLF v. Kline, supra,* at 1997–98.

The court nonetheless held that, in selling surplus land, GSA must obtain development plans from the party whose bid or private offer it intends to accept and to supplement its FEIS with analysis of those plans "if those plans reveal that the prospective buyer intends to use the property in a manner significantly different from any potential use anticipated by the FEIS." *Id.* at 2002. Such plans, it reasoned, would be significant new information requiring EIS supplementation. *See* 40 C.F.R. 1502.9(c)(1)(ii) (agency shall prepare supplement to EIS in case of significant new circumstances or information relevant to environmental concerns).

GSA contends that once, having considered environmental impacts, it has decided that property should be sold, FPAS requires it to obtain the greatest possible financial return from that sale without regard to environmental or other factors. It is true that when there is a "clear and unavoidable conflict" between the require-

ments of NEPA and another statute, NEPA must yield. *Flint Ridge Development Company v. Scenic Rivers Ass'n,* 426 U.S. 776, 788, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205 (1976). And the district court agreed that the language and legislative history of FPAS "require GSA to put financial factors before environmental factors in choosing a purchaser of surplus real estate" and that GSA may not therefore choose among potential buyers on the basis of environmental factors in the first instance. *CLF v. Kline, supra,* 16 Env't Rep.Cas. at 1997. It found, however, that "GSA has both the power under FPAS and the duty under NEPA to consider refusing to consummate both private and public sales if, weighing environmental concerns, sale to a particular buyer would not be 'in the public interest.'" *Id.* at 2002.

To reach that conclusion the court relied on the proviso in 40 U.S.C. § 484(e)(2)(C):

"award shall be made with reasonable promptness by notice to the responsible bidder whose bid, conforming to the invitation for bid, will be most advantageous to the Government, price and other factors considered: *Provided,* That all bids may be rejected when it is in the public interest to do so."

Based upon the language of the statute— "juxtaposition of the broad concept of 'public interest' and the narrower reference to financial 'advantage' indicates that Congress meant to distinguish the two"—and its legislative history, the court concluded that Congress intended the term "public interest" to convey more than financial advantage and that NEPA and FPAS can therefore be harmonized by including environmental concerns within its gambit. *Id.* at 2002–03.

■ Accepting without deciding that FPAS and NEPA can be thus harmonized, we are nonetheless not convinced that requiring GSA to supplement its EIS in the light of a high bidder's development plans before accepting that bid can pass muster under a rule of reason. We reach that

conclusion for the very reasons expressed by the district court in deciding that it was unreasonable to require GSA to analyze specific development plans in the first instance.

"A particular buyer might change its development plans by the time an EIS were complete. Moreover, subsequent purchasers from the original GSA grantee might use the land in a manner not envisioned by GSA or the original buyer's development plans. In light of such possibilities, a proposal-specific EIS might well be a waste of federal funds."

Indeed, a bidder may intend to buy the land for the very purpose of speculation and resale. Even assuming that the good faith of the prospective buyer could be assured and that his development plans would not be submitted cynically with one eye on the FEIS, we find it unreasonable to require EIS revision before consummation of the sale when GSA has no power to assure that the scrutinized development plans are ever implemented.

Under the district court's scheme, supplementation of the FEIS in the event of unanticipated development plans would presumably be for the purpose of rethinking the decision to dispose of the land at all. But that decision should have been made, as we seek to ensure by affirming the first part of the district court's opinion, with informed consideration of the varied reuses to which the land might be put in the immediate and subsequent future and of the fact that some reuses may not be anticipated. There must be a limit to reconsideration of that which the agency has no power to control. Nor do we thus open the floodgates to environmental degradation. Any reuse of the surplus lands by successful bidders will be fully subject to the substantive constraints of local zoning laws and local and federal environmental standards. That part of the district court's opinion which requires GSA to obtain development plans from the party whose bid or private offer it intends to accept and to supplement its FEIS on the basis of such plans is reversed.

*Affirmed in part and reversed in part.*